FILED

2005 Nov-07  PM 02:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALLEN KILGORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:04CV0637-VEH** |
| | ) | |
| **McKESSON CORPORATION,** | ) | |
| **A corporation; McKESSON** | ) | |
| **HEALTH SOLUTIONS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## Memorandum Opinion

The Court has before it the motion of Defendants McKesson Corporation and

McKesson Health Solutions, LLC[1] for summary judgment.  For the following reasons,

the motion is due to be **GRANTED**.

Plaintiff Allen Kilgore (Kilgore) commenced this action on March 29, 2004,

by filing a complaint in this court.  Kilgore contends that McKesson's alleged

conduct constitutes (1) violation of Ala. Code § 8-24-2[2]; (2) breach of contract; (3)

---

[1]The Defendants will hereinafter be referred to as "McKesson."

[2]Although the Court finds that each of Kilgore's claims is preempted by ERISA (discussed below), the
Court also finds that summary judgment as to Count I of the Complaint is due to be granted on the merits of the
claim.  Count I alleges that McKesson violated Ala. Code. § 8-24-1, *et seq*., which provides in pertinent part:
> (c) All commissions that are due at the time of termination of a contract between a *sales*
> *representative* and *principal* shall be paid within thirty days after the date of termination.
> Commissions that become due after the termination date shall be paid within thirty days after the
> date on which the commissions become due.

Ala. Code § 8-24-2(c) (emphasis added).  The "definitions" section of this act defines "sales representative" as
"[a]ny person who engages in the business of soliciting, on behalf of a principal, orders for the purchase at wholesale

fraud; and (4) breach of duty of good faith and fair dealing[3].

All parties have filed briefs and submitted evidence in support of their respective positions.  The Court has considered all of the record evidence and all arguments of counsel.

---

of the product or products of the principal, but does not include a person who places orders or purchases for his or her own account for resale, or a person engaged in home solicitation sales."  Ala. Code § 8-24-1(3).  "Principal" is defined as "Any person who does all of the following: a. Engages in the business of manufacturing, producing, importing, or distributing a product or products for sale to customers who purchase the product or products for resale . . . b. Utilizes sales representatives to solicit orders for the product or products . . . c. Compensates the sales representatives, in whole or in part, by commission."  Ala. Code § 8-24-1(2).

     McKesson urges that the parties in this case cannot be considered either sales representative or principal, because what was sold is not a "product".  The issue then becomes whether Triage services, and Disease Management services, and Utilization Management/Case Management (UM/CM) services are "products" under the Alabama statute.

     The term "product" is not defined by the statute or by any Alabama case.  However, it is a maxim of statutory construction that:

> Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect. *Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County,* 589 So.2d 687 (Ala.1991).

*IMED Corp. v. Systems Engineering Associates Corp.*, 602 So.2d 344, 346 (Ala.,1992).  *Black's Law Dictionary* defines product as:

> Something that is distributed commercially for use or consumption and that is usu. (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption.

*Black's Law Dictionary* (7th ed. 1999), at 1225.  *Webster's* defines it as "[a]nything produced, as by generation, growth, labor, or thought."  *Webster's New Collegiate Dictionary* (2d ed. 1956).

     These definitions dictate that the type of services involved in this case are not "products" within the definition of the statute.  In addition, the Court has found no Alabama case in which services were at issue in a claim brought for failure to pay commissions under this statute.

     Based on this analysis, the Court concludes that Ala. Code. § 8-24-1 does not apply to commissions claimed on services sold.  Accordingly, the Motion for Summary Judgment as to Count I is due to be **GRANTED**.

     [3]Kilgore "withdraws his separate claim for breach of the duty of good faith and fair dealing as that claim is subsumed into his claim for breach of contract and should be dismissed."  *Plaintiff's Response to Motion for Summary Judgment*, at 15.  Accordingly, as to Count IV, Summary Judgment is due to be **GRANTED**, and Judgment is due to be entered in favor of McKesson and against the Plaintiff.

Pending before the Court is McKesson's Motion for Summary Judgment (Doc. 17). McKesson asserts that ERISA preemption precludes all of Kilgore's claims and, therefore, McKesson is entitled to complete summary judgment.

## Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party

may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case.  *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

5

(1992)).

## Facts

### Kilgore's Employment With McKesson Health Solutions LLC

In July, 2001, Allen Kilgore was hired as a sales executive for McKesson Health Solutions LLC ("MHS").  Kilgore was paid a base salary of $70,000, plus commissions.  MHS's customers are healthcare payors and providers.

**1.      Reorganization of MHS**

In October, 2001, MHS reorganized its sales force so that sales executives sold products or services, but not both. Kilgore chose to sell services.  Kilgore sold Triage services,  Disease  Management  services,  and  Utilization  Management/Case Management (UM/CM) Services.  In Triage services (Triage), nurses take calls from patients and refer them to the appropriate level of care.  Disease Management services (DM) are based around programs for diabetes, asthma, heart failure, and coronary artery disease in which call patients enrolled in those programs.

**2.      The "SIP"**

**i.      Signing and Effective Dates**

In September 2002, Kilgore and MHS signed the 2003 Sales Incentive Plan (the "SIP") which was effective April 1, 2002, to March 31, 2003.

**ii.      How Commissions Are Earned**

6

According to Kilgore, a commission is "earned" when a sales contract is signed. *Kilgore Depo. Vol. 1*, at 193.  The SIP states that "[a] commission is fully earned when a Qualified Sale of a Qualified Product or Service has been made, the product or service has been delivered to the customer, and timely payment has been received and retained by the company."  *SIP*, at 2.  A commission is "fully earned" at the end of the year after the amount received on the contract has been reconciled. Commission payments made prior to the commissions being "fully earned" are "advances on the earned commissions." Normally, there is a period of time between when the contract is signed and the "go-live" (contract start) date.[4]

The Addendum to the SIP also says:

> After actual contract revenue is determined, the Sales Quota Credit and commissions earned on the Qualified Sale will be recalculated in light of the actual revenue  . . .  If the commission earned is less than the commission already advanced, the Company will recover the commission advances previously paid by deducting it from new commission advances until the previous advances are repaid.  If this is not sufficient to cover the advances, repayment will be required in the month after the close of the applicable quarter or fiscal year, or at the time of the employee's resignation or termination, whichever is sooner.

*SIP (Exhibit 1)* at § 1(d).

----

[4] Susan Robinson, accounting manager at McKesson, testified that commissions can be partially earned.  *Robinson Depo.*, at 40.  She stated that if a sales executive leaves before 12 months, then a calculation is done to determine how much commission is earned to date. *Id.* at 40-41.

Under the SIP, commissions are earned as a percentage of actual first year revenues from sales made during the plan year.  Employees earning commissions under the SIP were excluded from any other incentives.  The SIP says with regard to commissions:

> Sales Executives will earn the higher commission rates set forth in column two of the above commission rate schedule only for Qualified Sales of Qualified Triage, Disease Management and Member Communication Products or Services he or she makes to new customers.
>
> Sales executives who make a Qualified Sale of a Qualified Product or Service to a new customer are eligible for Sales Quota Credit and commissions on subsequent Qualified Sales of Qualified Products or Services that he or she makes to that customer within twelve months following the "go live" date of the first Qualified Sale.

*Id.* § 1(b).  The SIP also says:

> Due to the nature of Triage, DM....., Sales Quota Credit and commission advances will be based on the estimated first year contract revenue of the Qualified Sale.  The actual revenue of the Qualified Sale cannot be calculated until the service has been delivered.

*Id.* at §1(c).  On Triage, the SIP pays "1/3 of commission advance at contract execution; 1/3 at contract 'go live'; 1/3 at first payment to MHS."  The SIP pays DM (Population): "1/3 of commission advance at contract execution; 1/3 at contract 'go live' date; 1/3 3 months after go live date.  "On DM(Risk), the SIP pays: "1/3 of commission advance at contract execution; 1/3 based on actual experience in the 6th month from 'go live'; 1/3 based on actual experience after the 12th month from 'go

8

live'..."

### iii.    In the Event of Resignation or Termination of Employee

The SIP provides that upon resignation or termination of an employee:

> Any outstanding commission advances, bonus advances or other monies that an employee owes MHS at the time of termination will be deducted from any remaining salary, commissions, time off payments, bonus awards, or other compensation owed to the employee. MHS will deduct such sums owed from the employee's final paycheck.

*SIP*, at § 7.

### iv.    Changes to the SIP

The text of the SIP expressly provides for changes to the contract.  The SIP

states:

> The company reserves the right at its sole discretion to revise the [SIP] to ensure consistency with overall business objectives and requirements. Any changes will be confirmed in writing to those plan participants who are affected.

*SIP* at ¶2.

### v.    Claims and Review Procedure for Commissions

The text of the SIP includes a claims and review procedure for sales executives

who have been deprived of commissions.  Pursuant to the SIP, the sales executive

should notify the sales manager or HR to request a review.

### 3.    Elimination of Kilgore's Position

In April, 2003, Jerry Miller became Kilgore's supervisor.  In April or early May 2003, MHS reorganized again and this resulted in Kilgore's position being eliminated.  On about May 1, 2003, Miller told Kilgore what was going to happen with the reorganization.  Kilgore's last day was June 30, 2003.

Michelle Miller, who was a McKesson sales representative with Allen Kilgore, was also terminated as of June 30, 2003.  In the days leading up to the McKesson reorganization, Jerry Miller had conversations with Allen Kilgore and Michelle Miller about their termination and he told both of them that they would be paid full commissions on any contracts that were signed before June 30, 2003.  *M. Miller Depo*. at 13, 16; *Kilgore Depo. Vol. I*. at 240.  These conversations between Michelle and Jerry Miller started sometime in the Spring of 2003. *M. Miller Depo*. at 12.  Allen Kilgore and Michelle Miller were told by Jerry Miller that these commissions would be paid as part of the severance package. *Kilgore Depo. Vol. I,* at 240.

Jerry Miller, in his deposition, testified:

My recollection was that, as I told both Michelle and Allen, any new contracts they signed from the time we notified them they were going to be terminated through June 30 of that year, that on any new contracts they signed, I had gone to my boss, Sandeep Wadhwa, and Bill Gilmore in finance, and gotten the authority from them to offer an additional incentive to have them try to close these deals before the end–before they left.

And that what we would do would be determine what we

10

estimated the revenue would be for that contract for the first 12 months, and that we would then pay them a commission on that earned at that point.

*J. Miller Depo.*, at 137.

After receiving the separation agreement but before it was signed, Kilgore had between six and eight conversations with Jerry Miller about the terms of his separation. Specifically, they discussed how commissions were going to be paid on the Humana contract, the Oklahoma High Risk Pool contract, SSS/CCC contract, and MCS contract, all of which were already in house but commissions had not been fully paid. At the time of these conversations, although the Humana contract had already been signed, Kilgore was still doing work on the Humana Contract.

During these conversations, Jerry Miller confirmed that he was going to pull the contracts and confirm the amount of commissions that were owed to Allen Kilgore on the Humana, Oklahoma High Risk Pool, SSS/CCC, MCS, and Blue Cross\Blue Shield of Mississippi contracts.   These conversations all took place before the separation agreement was signed by Allen Kilgore.[5]

### 4.    The Separation Agreement

On May 2, 2003, Fred Arndt, MHS's HR Director, sent Kilgore a separation agreement that set out his severance package.   The separation agreement,which

---

[5]McKesson disputes that the substance of these conversations took place.

governs all aspects of the employee's termination, reads:

> This agreement, including exhibits A and B, constitutes the complete, final and exclusive embodiment of the entire agreement between you and the company with regard to this subject matter.  It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supercedes any other such promises, warranties or representations.

"This subject matter" refers to paragraphs 1-16 of the separation agreement.

Paragraph 7 of the separation agreement provides:

> Any commission payments earned and due under the terms of the sales incentive commission plan will be paid to you under the terms of the commission plan.  These commissions will be paid provided McKesson has received and accepted a signed services agreement by 6/30/03. If no signed agreements are received by June 30, 2003, no commissions will be paid.  Any commissions paid will be paid on the normal commission payment schedule.

The separation agreement also provided that Kilgore would receive an additional 4 weeks of base salary under the severance pay plan.  In exchange for signing the separation agreement, Allen Kilgore would receive one month of paid health insurance less his contribution, and outplacement assistance with a third party--Right Management.  In addition, the non-compete clause was limited to six months.

It is undisputed that the  SIP is what is referred to in the separation agreement as "the Sales Incentive Commission Plan."  Attached to the separation agreement was a summary plan description for the McKesson Corporation Severance Pay Plan,

which provided a claims and review procedure.

In the separation agreement, the Plaintiff agreed to release all claims:

[K]nown and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way related to agreements, events, acts or conduct at any time prior to and including the execution date of this Agreement, including but not limited to: all such claims and demands directly or indirectly arising out of or in any way connected with your employment with the Company or the termination of that employment; claims or demands relating to salary, bonuses, commissions,... severance pay, or any other form of compensation; claims pursuant to any federal, state or local law, statute, or cause of action including, but not limited to,... tort law; contract law;... fraud; ... and breach of implied covenant of good faith and fair dealing."

*SA*, at ¶ 14. The separation agreement also contains the following paragraph:

15. **Waiver.** In granting the release herein, you understand that this agreement includes a release of all claims unknown or unknown. In giving this release, which includes claims that may be unknown to you at present, you acknowledge that you have read and understand Section 1542 of the California Civil Code which reads as follows: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which if known by him, must have materially effected his settlement with the debtor."** You hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to the release of any unknown or unsuspected claims you may have against the Company. (Emphasis in the Original)

Kilgore signed the separation agreement on June 5, 2003. Although he still had

questions, Kilgore stated he signed the agreement because Janell Lewis in HR

threatened that if he did not get the agreement in they would negotiate another

13

severance or he might not get a severance.  Kilgore received his four weeks of severance pay.

The separation agreement that was signed by Michelle Miller was virtually identical to the one signed by Kilgore. *M. Miller Depo*. at 20.  Fred Arndt drafted the separation agreement. Arndt believes either Jerry Miller or Sandeep Wadhwah likely assisted him in drafting paragraph ¶ 7 of the separation agreement, but he cannot confirm that positively.  The language in ¶ 7 of the separation agreement that deals with the payment of commissions on contracts signed before June 30, 2003, is consistent with what Michelle Miller and Kilgore were told by Jerry Miller in their conversations leading up to the signing of the separation agreement.

Jerry Miller acknowledges that the second, third and fourth sentences of ¶ 7 of the separation agreement are new - not contained in the SIP plan.  Jerry Miller explained that his offer to pay commissions on any deals closed by June 30, 2003, was "an additional incentive outside of the comp plan, the SIP, to encourage them to stay focused and try to close these deals before the end of the period."   Susan Robinson, Vice President of government sales at MHS, testified that Jerry Miller's agreement to pay sales commissions on contracts signed before June 30, 2003, was "outside of the sales incentive plan" and was "a special incentive offer."  The plan to offer this additional incentive to Michelle Miller and Allen Kilgore resulted from a

14

meeting between Jerry Miller (V.P. of Sales), Bill Gilmore (Director of Finance), and Sandeep Wadhwah (Head of Sales). At the time of this meeting, it was decided that this was the best way to maximize the effort and return on the sales employees.

The monetary severance benefits for Allen Kilgore would have been processed like normal paychecks out of the payroll department in San Francisco and would have been paid on a normal payroll schedule.

### 5.    Additional Sales Procured By Kilgore

After his conversations with Mr. Miller, Kilgore continued to procure sales.[6] He procured a signed services agreement from Humana for DM services between June 5 and June 30, 2003. *Kilgore Depo. Vol. I*, at 267-269.  He also worked on the SSS/CCC account throughout June, 2003, as he attempted to increase the reach of the disease management program in their commercial line of business and sought to bring in new technology and services into their existing utilization management department. *Kilgore Affid*., at ¶ 1.  He also worked in June, 2003, with the director and legal counsel of the Oklahoma High Risk Pool (OkHRP) to gain support for the existing contract and to add additional CareEnhance Nurse Triage services to support

---

[6]McKesson states that "[w]hat Miller said is disputed but it is undisputed Kilgore made no sales after this conversation."   However, the references cited do not support this proposition. *See* Kilgore dep.V.1,p. 232-3, 238-240, 288-9, 303-5, 322, 336-7, V.2,p.78 & Ex.18*. (cited by Defendants)*.  In any case, the references cited by the Plaintiff supports *his* proposition and the Court <u>must</u> view the evidence in the light most favorable to the non-movant.

the entire population.  *Id.* at ¶ 2.

### i.   Humana

The Humana Puerto Rico (Humana) contract was signed on March 31, 2003. The Humana contract was for Triage and DM.  Kilgore's commission advance on the Humana contract was $4,139.10.   At the time of his termination, Kilgore's unearned commission advances were $4,139.10 and  Humana had not paid anything to MHS. Humana did not pay MHS until September 29, 2003. The Humana contract was signed on March 26, 2003, and had a start date of April 1, 2003.[7]  Payments are made by the customer to MHS after the contract "goes live".  *J. Miller Depo*. at 99.  Allen Kilgore procured a signed services agreement from Humana after he signed the separation for DM services between June 5 and June 30, 2003.

### ii.   SSS/CCC

The  SSS/CCC  contract  was  a  (DM)  contract.    MHS  had  a  contractual relationship with SSS/CCC dating back to 1997.  The SSS/CCC contract Kilgore is claiming he is owed commissions on is the September 13, 2002, addendum providing DM services.   The sales person MHS listed on the SSS/CCC contract was Mike Modiz, Vice President of special projects.  Kilgore says he did work on the contract.

---

[7]The Plaintiff contends that "Six months passed between the date the Humana contract was signed and the go-live date."   In support he cites *Kilgore Depo. Vol. I.*, at Ex. 16, p. 17 and Ex. 17.  Nothing in those sections supports that contention.

Sheryl Riley, who worked first in product consulting and later at sales at McKesson, testified that sales reps were not expected to work on a contract if they could not earn a commission.[8]  *Riley Depo.*, at 53-54.  MHS asserts that it did not pay Kilgore a commission on SSS/CCC because the SIP only paid commission on new sales to new customers or sales to existing customers within the first 12 months after the initial sale and that SSS/CCC was not a new customer.  *J. Miller depo.* at 75.  The Plaintiff disputes this by saying "SSS/CCC was a new customer *to me* when I started working with them in 2002."   *Kilgore Affid.*, at 1.  Ms. Riley testified that the SSS/CCC  business which the Plaintiff sold involves "new" business, in particular, DM business, which, according to her, had never been sold to them before.  *Riley Depo.*, at 23-24.

Kilgore visited SSS/CCC many times and Riley attended meetings with him at SSS/CCC on two occasions.  Kilgore was working on a new piece of business with SSS/CCC-- Disease Management. Riley helped Kilgore put together a presentation to MHS that set forth all of the business opportunities and the advantages of providing disease management services to SSS/CCC.  When Riley learned that Kilgore had not been paid a commission on the SSS/CCC deal, she spoke to special projects VP Mike Modis that she believed Kilgore should be paid a commission on

---

[8]McKesson disputes this contention.

the deal.

### iii.    Oklahoma High Risk Pool (OkHRP)

On 12/5/02, Kilgore sold a Disease Management (Risk) (DM(Risk)) contract to Oklahoma High Risk Pool (OkHRP).

On the DM (Risk) OkHRP deal, the Plaintiff was paid an advance of $1,873.55 at signing.  Susan Robinson, who administered the SIP, sent Kilgore a spread sheet showing this payment.

As of June 30, 2003, the total commission advance paid to Kilgore was $1,873.55; the total commission earned as of that time was $1,436.31.  The commission advanced but not earned at separation was $437.24.

The date the OkHRP contract was signed was December 5, 2002, and the go live date was February 1, 2003. *J. Miller Depo.*, at 99.  The amount of time between the go-live date, the contract signing, and the implementation is considered "normal."

### 6.    Plaintiff's Request for Commissions

In an email to HR director Fred Arndt, Kilgore claimed commissions under the "severance agreement" for four contracts.  Kilgore attached a document to the email with the commissions he said he was owed and the contracts. These were SSS/CCC, Oklahoma High Risk Pool (both the MHS and CMS parts), Humana, and MCS.  By letter of January 15, 2004, Miller responded to Kilgore, explaining he was not due

any additional commissions.

Fred Arndt was the Director of Human Resources for McKesson during this time.  *Arndt Affid.*, at 1.  In his affidavit he testified as follows:

5)  The Severance Plan Claims and Review Procedures set out in the Summary Plan Description says: "All claims should be sent to vice president, Compensation and Benefits, One Post Street, San Francisco, California 91404."

6)  Kilgore did not present a claim to that office.

7)  If the December 2003 e-mail is considered to be a claim under the severance plan, Kilgore failed to use the Review Procedure under the Severnace [sic] Plan.

8)  The Review Procedure provides: "The request for review must be filed within 90 days after the denial (or deemed denial) of the initial claim, and should be addressed to the Plan Administrator, McKesson Corporation Severance Pay Plan, c/o Senior Vice President, Human Resources, McKesson Corporation, One Post Street, San Francisco, CA 94104."

9)  Kilgore did not make a request for a review under the Severance Plan.

*Id.* at 1-2.  The Plaintiff disputes this only by stating that "Allen Kilgore made written claims to his manager Jerry Miller and to the head of Human Resources, Fred Arndt about the sales commissions owed."  *See Kilgore Depo. Vol. 1*, Ex. 6,7,8 (*cited by Plaintiff*).

## Analysis

In moving for summary judgment, McKesson asserts that the severance plan  at

19

issue is an ERISA plan, that all of Kilgore's State law claims relate to the McKesson Plan, and that Kilgore failed to exhaust administrative remedies as is required under ERISA. These assertions require the Court to begin its analysis with a brief discussion about preemption as it relates to ERISA. The first type of preemption is "Complete preemption," also known as "superpreemption," which arises from Congress's creation of the comprehensive remedial scheme in ERISA for loss or denial of employee benefits. ERISA § 502, 29 U.S.C.A. § 1132; *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1212 (11th Cir. 1999). Where Congress preempts an area of law so completely that any complaint raising claims in that area is necessarily federal in character, super preemption applies, and federal jurisdiction exists. *Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1330 (11th Cir. 1998). Therefore, superpreemption converts State law claims into federal claims for purposes of the well-pleaded complaint rule, allowing a defendant to remove the case to federal court. However, it is particularly important to note that ERISA superpreemption exists only when the plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a); *Butero*, 174 F.3d at 1212; *Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1330 (11th Cir. 1998). The present case was originally filed in federal court; therefore, McKesson is not arguing that super preemption applies.

The second type of preemption is "defensive preemption," which defeats claims

that seek relief under State law causes of action that relate to an ERISA plan.  29 U.S.C. § 1144(a).  The civil enforcement provisions of ERISA provide exclusive remedy available to recover benefits due under an ERISA plan.  *Pilot Life Ins. Co., v. Dedeaux,* 481 U.S. 41 (1987).  Any common law or statutory claim of a person seeking to recover ERISA plan benefits is preempted.  29 U.S.C. § 1144(a); *Metropolitan Life Ins. Co., v. Taylor*, 481 U.S. 58 (1987).  "Defensive preemption," originating in ERISA's express preemption provision, provides an affirmative defense to certain State law claims.[9]  Defensive preemption **requires** that the Court dismiss State law claims that "relate to" an ERISA plan.  29 U.S.C. § 1144(a); *Lordmann Enters. v. Equicor, Inc*., 32 F.3d 1529, 1532 (11th Cir. 1994)(emphasis added).   The Court must therefore begin by first determining whether the McKesson Severance Plan is in fact an ERISA plan.  If the Court determines that the Plan is an ERISA plan, the Court must continue its analysis by determining whether the claims alleged by Kilgore "relate to" the Plan.

## A. THE MCKESSON PLAN IS AN ERISA PLAN

Kilgore asserts that the McKesson Plan is not an "employee welfare plan" under ERISA.  To qualify under ERISA as an "employee welfare benefit plan," McKesson must satisfy the five  requirements articulated by the Eleventh Circuit in *Donovan v.*

---

[9]Complete preemption furnishes subject matter jurisdiction in federal courts whereas defensive preemption does not.  28 U.S.C.A. Section 1331; *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1212 (11th Cir. 1999).

*Dillingham*, 688 F.2d 1367 (11th Cir. 1982).  *Donovan* provides in pertinent part:

> A welfare plan requires (1) a "plan, fund, or program" (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits, (5) to participants or their beneficiaries.

*Donovan*, 688 F.2d at 1371.

The first step in the *Donovan* analysis requires the Court to determine whether the McKesson Plan is in fact a "plan, fund, or program."  The Eleventh Circuit has adopted a "flexible analysis" for determining whether an ERISA "plan" is established. *Williams v. Wright*, 927 F.2d 1540, 1543 (11th Cir. 1991).  A "plan" exists where, "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan*, 668 F.2d at 1372.  In the instant case, McKesson has provided its employees, specifically, Kilgore, with all of the requisite information necessary to satisfy the Eleventh Circuit interpretation of what a "plan"is under ERISA.  In addition to distributing the separation agreement which provided for the severance plan, McKesson distributed a summary plan description (SPD), which set forth the criterion by which McKesson determined the intended benefits, such as salary, health benefits,

22

and unpaid earned commissions to be paid upon termination of employment.   It provides that the intended class of beneficiaries are those who have experienced termination of employment and are "eligible" under the guidelines of the Plan.  It states that financing is provided by McKesson and it sets forth the procedures for receiving benefits and the procedures for claims review and appeals.  (Def. Supp.  Ex. 2, p.1-8).

Kilgore's sole argument in response to McKesson's assertion that Kilgore's claims are preempted by ERISA is that McKesson's Plan fails to satisfy what Kilgore refers to as the "ongoing administrative program requirement."  Kilgore argues that the first requirement of a "plan, fund, or program" under ERISA requires McKesson to establish that the implementation of the severance plan requires an "ongoing administrative scheme."  (Pla. Brief p. 2).  Kilgore relies primarily on the United States Supreme Court case *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1 (1987). This Court concludes that Kilgore's reliance is misplaced because *Fort Halifax* is clearly distinguishable from the present case.

In *Fort Halifax*, the Maine Director of Bureau of Labor Standards commenced an action to enforce provisions of a State severance pay law.  The Maine statute required employers to provide a one time severance payment to employees in the event of plant closing.  *Fort Halifax,* 482 U.S. at 11-12 (1987).  The United States Supreme Court held that the statute was not preempted by ERISA because the requirement of

employers "to provide one time severance payments to employees in the event of plant closing neither established nor required the employer to maintain an employee welfare benefit plan within the meaning of federal law..." *Id*. The Court articulated:

> Congress intended preemption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation.

*Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11-12 (1987). Although the instant case also involves severance pay, the cases are markedly dissimilar to each other.

The Court attributes Kilgore's conclusion to a failure to recognize the context in which the Supreme Court was employing the aforementioned "ongoing administrative program" language. In the instant case, the severance Plan does not merely consist of a requirement that it provide one single lump sum payment to employees upon termination. The evidence submitted demonstrates that McKesson established its Plan to pay severance benefits on an ongoing basis to its eligible employees and those of its subsidiaries and affiliates upon termination of employment. (Def. Brief, p. 7). The payments may be in the form of a lump sum payment or may be in installment payments. (Def. Supp. Ex. 2, p. 5) Furthermore, the McKesson Plan requires that the employee's termination meet two discretionary criteria:

24

> (1) a permanent or extended period of reduction in positions due to business conditions, plant closures, sale of a facility, departmental reorganization, job consolidation, or other similar circumstances   (Def. Ex. 2, p.2); and (2) the company designates such employees as eligible to participate in the plan.

*Id.*    Unlike employers subject to the *Fort Halifax* one time payment, McKesson maintains the authority to determine the satisfaction of both of the aforementioned criteria before an employee even becomes eligible for severance pay.  *Id.*  McKesson's plan is guided by the requirements of ERISA,  whereas the Maine statute in *Fort Halifax* is a single requirement based upon the happening of a single occurrence.

As further evidence that its plan is an ERISA plan, McKesson submitted evidence in the form of the separation agreement and SPD, which provide the employees with a detailed description of: how a person may become eligible to participate in the plan, the mechanics of how one may qualify for severance pay benefits under the plan, how a person may lose severance pay, the circumstances for which repayment of forfeiture of severance pay may occur, an explanation of McKesson's sole discretionary authority to determine the amount of severance pay to be paid, how benefits are paid, how to apply for benefits, and the claims and review procedures for disputes regarding the severance payment.  (Def. Supp.  Ex. 2, p.5-6). McKesson also provides employees with specific plan information such as the "Plan

Sponsor," the "Plan Administrator," the employer identification number and plan number, the source of the payments, the mandatory claims and review procedures, and information regarding the employee beneficiaries' rights and protection under ERISA. (Def. Supp. Ex. 2, p.7-8).

The Court has determined that in creating and implementing its plan, McKesson intended it to be an ERISA plan and, accordingly, it succeeded in creating an ERISA plan. *ERISA* § 402(a)(1), § 102(a)(1); 29 U.S.C. § 1102(a)(1), § 1022(a)(1); (Def. Supp. Ex. 2, p.8). The McKesson Plan includes all of the following requirements of an ERISA plan: it maintains discretionary authority regarding the eligibility of employees to participate in the Plan, it has a formal and mandatory claims and review process, and it provides the employees with a detailed SPD. This provides ample support that the McKesson Plan is an ERISA plan.

The second step in the *Donovan* analysis requires the plan to be "established or maintained." *Donovan*, 688 F.2d at 1372. A written instrument that constitutes a plan satisfies this requirement. *Id*. It is undisputed that the McKesson Plan satisfies this requirement.

In *Donovan*, the Court articulated that requirements three, four, and five are self explanatory or defined by statute. *Donovan,* 688 F.2d at 1371. Kilgore has not

disputed that McKesson's Plan satisfies requirements two through five of Donovan.[10]

### B. KILGORE'S CLAIMS  "RELATE TO" THE MCKESSON PLAN[11]

Next, the Court must examine whether Kilgore's claims "relate to" McKesson's Plan as required under ERISA.  The Court finds that they do.

ERISA is a comprehensive legislative scheme enacted by Congress "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90 (1983). Through the enactment of ERISA, Congress also intended to safeguard employer's interests by "eliminating the threat of conflicting and inconsistent State and local regulation of employee benefit plans." *Id.* at 99 ( *quoting* 120 Cong.Rec. 29197, 29933 (1974)).  ERISA thus expressly provides for the preemption of "any and all state laws insofar as they may now or hereafter **relate to** any employee benefit plan...." (emphasis added) 29 U.S.C. § 1144(a); *Variety*

---

[10] The Court will briefly address the remaining *Donovan* requirements: McKesson Corporation, as plan sponsor, is an employer, thereby fulfilling requirement three.  As articulated in the written instrument, the purpose of the Plan is to provide severance benefits to certain terminated employees. (Def. Ex. 2, p. 2-3).  In *Massachussetts v. Morash*, 490 U.S. 107, 116 (1989), the United States Supreme Court explained that  "plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans within the meaning of the Act [ERISA]."  Finally, the Plan satisfies the fifth criterion because the SPD identifies who is eligible as a participant, how they qualify for benefits, and how they are paid. (Def. Ex. 2, p. 2-3).

[11] Kilgore did not dispute that the claims "relate to" McKesson's Plan in his brief in opposition to McKesson's Motion for Summary Judgment or in his supplemental brief which the Court ordered the parties to file to further develop the ERISA issue.

*Children's Hosp., Inc., v. Century Med. Health Plan, Inc.*, 57 F.3d 1040, 1042 (11th Cir. 1995).

The Eleventh Circuit explained that when faced with the issue of preemption, courts must at all times keep in mind this basic tenet: "[t]he question of whether a certain state action is preempted by federal law is one of congressional intent. The purpose of Congress is the ultimate touchstone." *Forbus v. Sears Roebuck & Co.,* 30 F.3d 1402, 1405 (11th Cir. 1994) *(citing Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45 (1987)).  Specifically, the primary focus of ERISA preemption analysis has been the "relate to" language of § 514(a) of ERISA.  The "key to § 514(a) is found in the words 'relate to.'" *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 138 (1990). The United States Supreme Court explained, "a law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Forbus v. Sears Roebuck & Co.,* 30 F.3d 1402, 1405 (11th Cir. 1994) *(citing Shaw,* 463 U.S. at 96-97).

In *Butero v. Royal Maccabees Life Insurance*, the Eleventh Circuit explained, "it has long been established that claims such as [breach of contract, bad faith refusal to pay, and fraud]..." relate to an ERISA plan.  *Butero v. Royal Maccabees Life Ins*, 174 F.3d 1207, 1215 (11th Cir. 1999)(*See Pilot Life*, 481 U.S. at 47-48).  This Court also finds persuasive the District Court's opinion in *Revells v. Metropolitan Life Ins.*

*Co.*, in which the court concluded that the plaintiff's claims for breach of contract and bad faith related to the employee welfare plan because they were based on defendant's failure to pay benefits and because the court would have to evaluate the terms of the policy to ascertain whether the benefits were due. *Revells v. Metropolitan Life Ins. Co.*, 261 F. Supp. 2d 1359 (M.D. Ala. 2003).  Kilgore's claims of breach of contract and fraud involve the promise by Miller to pay the commissions that Kilgore alleges he is owed **under** the McKesson severance plan.  Kilgore asserts that he is owed the money because he was told by Miller that the commissions at issue would be paid as part of the severance package. *Kilgore Dep*. Vol. I, p. 240.  Neither Kilgore nor Miller assert that the commissions would or should be paid out under any other plan or agreement. Essentially, Kilgore is conceding that the claims relate to the plan by virtue of his assertion that  the reason he is owed the commissions is because they were promised to him as part of his severance plan. For the aforementioned reasons, the Court has determined that the claims "relate to" the ERISA plan and, accordingly, are preempted by ERISA.

## C. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Finally, McKesson argues that summary judgment should be entered against Kilgore because he failed to exhaust administrative remedies.  Kilgore responded to this assertion by explaining that he made written claims to his manager Jerry Miller and

to the head of Human Resources, Fred Arndt about the sales commissions owed. (Kilgore Dep. Vol. 1, Ex. 6-8).  However,  in his response to McKesson's Motion for Summary Judgment, Kilgore failed to rebut the contention that he failed to exhaust the necessary administrative remedies prior to proceeding with a lawsuit. (Def. Brief p. 10) In the Eleventh Circuit, a claimant in an ERISA action who fails to exhaust administrative remedies is  ordinarily barred from pursuing that claim in court.[12] *Counts v. Amer. Gen. Life and Acc. Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997).  The Eleventh Circuit has recognized the following "compelling considerations" for the exhaustion requirement: "(1) reduction of the number of frivolous lawsuits; (2) minimization of the cost of resolving disputes; (3) enhancement of the administrators' 'ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decision making process'; and (4) availability of 'prior fully considered actions' by the administrator to assist the courts.  *Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985).  Furthermore, the exhaustion requirement is consistent with Congressional intent that plans "provide intrafund review procedures." *Id.*    Kilgore was provided with and signed the

---

[12]District courts have discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate.  Employment Retirement Income Security Act of 1974, Section 2 et seq., 29 U.S.C.A. Section 1001 et seq. However, in the instant case, the Plaintiff did not assert that resorting to such remedies would be futile or inadequate; he simply failed to dispute the argument.  Therefore, the Court will not excuse the requirement.

separation agreement which provided for the severance plan and clearly established the mandatory review procedures for making legal claims for benefits under the plan. There is no dispute that Kilgore failed to follow the requirements set forth under the Plan. Based upon the evidence submitted, the Court finds that Kilgore failed to exhaust the administrative remedies by neglecting to file a claim or appeal of denial as required under ERISA and by the mandatory claims and appeals review process provided to him. Even when viewed in the light most favorable to the Plaintiff, the evidence clearly illustrates that the mandatory Severance Plan Claims and Review Procedures were not followed by Kilgore. Therefore, because the Court has determined that the McKesson Plan is in fact an ERISA plan, and because Kilgore failed to exhaust administrative remedies as required under ERISA, McKesson is entitled to summary judgment on this ground.

**Conclusion**

Based upon the foregoing, McKesson's motion for complete summary judgment will be **GRANTED** as to Kilgore's Complaint.  The Court finds ERISA preemption applies and, therefore, McKesson is entitled to judgment as a matter of law as to all claims asserted by Kilgore.  The opinion shall be carried out by separate order.

**DONE** and **ORDERED** this 7th day of November, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

32